Leiding *v.* Leiding, Appellant.

Argued April 27, 1937.

Before KELLER, P. J., CUNNINGHAM, BALD-RIGE, STADTFELD, PARKER, JAMES and RHODES, JJ.

*Henry Kauffman,* with him *Louis Little,* for appellant.

*Benjamin E. Friedman,* for appellee.

OPINON BY BALDRIGE, J., July 15, 1937:

The libellant filed this action in divorce, alleging cruel and barbarous treatment and such indignities to the person as to render his condition intolerable and life burdensome. A bill of particulars and answer thereto were filed and hearings were had before Judge ELDER MARSHALL, who held that the charges were supported by competent evidence, and granted a divorce. Respondent appealed.

It is our duty to consider all the evidence and express our independent conclusion, whether the wife's conduct constituted a sufficient cause for divorce: *Stein v. Stein,* 119 Pa. Superior Ct. 276, 180 A. 763.

The parties were married in Minnesota in 1903. At the time of the hearing each was about 55 years of age. Four children were born to this marriage, all now adults. A son and two daughters, one of whom is separated from her husband, live with their mother and are largely, if not entirely, supported by the alimony paid by the libellant. The fourth child is married and lives in the West. The parties resided in Minnesota until 1909, when they went to Ridgway, Pennsylvania, where they remained, with the exception of about a year, until 1923, when they moved to Allegheny County where the libellant obtained employment as a draftsman with the Westinghouse Electric and Manufacturing Company, his present employer.

We will not attempt to discuss all the evidence (although we have carefully read and considered it), but will refer only to some of the more important parts thereof.

The libellant testified that since early in their married life the respondent manifested a decidedly jealous disposition and entertained suspicions that he was guilty of immorality with numerous women of his acquaintanceship; that many times she accused him, before their children and others, of associating with

women of ill fame and "gold diggers" and of having illicit relations with them; that she consulted spiritualists and fortune tellers, who apparently encouraged and confirmed her apprehensions. The libellant took a commercial art course in a correspondence school in 1915 and 1916, and he drew a number of pictures, including subjects in the nude which the course required him to study and reproduce. He said they were not obscene or indecent, but of the type generally used by artists. Some of his work was exhibited to the trial judge that he might observe its general character. His wife showed such a displeasure of this endeavor that he abandoned his art studies. He was also a musician, and, as the children were musically inclined, he bought a violin, cello, clarinet and piano to encourage them in the development of their talent. He and all the children at one time belonged to an orchestra, comprised of 15 or 16 persons, which played mostly for Sunday schools and churches. There were 5 or 6 young girls, 16 to 19 years old, who were members of this organization, which caused the respondent to suspect her husband of improper conduct. He testified further that several times she threatened to poison him and pound his head off with a hammer. He told of her scolding, nagging, and calling him gross and opprobrious names. Her course of conduct interfered with his rest to such an extent that to obtain sleep at night he occupied a small couch downstairs. As a result of this continuous treatment, he became so physically and nervously affected that he lost weight and his working ability became so impaired that he found it necessary to leave his home in order to retain his job. He was corroborated to a considerable extent by credible and unbiased witnesses, whose demeanor was very favorably commented upon by the trial judge, and their testimony has impressed us as being truthful.

Mr. Fitzgerald, under whom the libellant worked,

testified that the respondent told him on several occasions in 1933 and 1934 that her husband was running around with other women; that in 1933 while he was ill, she and her son visited his house and, in the hearing of her son, advised his wife not to have a nurse as one in her house tried to give her poison because she wanted to "steal her man." Her son said she was dreaming and advised her not to talk that way. She insisted that her husband was running around with other women and said he was the meanest man in the world, a devil, and a whoremaster; that he was spending about $120 a month to keep another woman in an apartment in Wilkinsburg. When Fitzgerald tried to correct this impression by telling her that Leiding's average wage was in the neighborhood of but $180, she called him a liar. She again visited his home, this time in company with her youngest daughter, and threw on the table a number of pictures of women with whom she said her husband was keeping company. It developed that these snapshots, taken at a picnic of the employees of the Westinghouse Company, were mostly of young women who were employees or wives of attorneys working in the same office with the. libellant, and who have a very high reputation. She referred to them as immoral women who were trying to entice her husband away. He tried to placate and reassure her that her suspicions were unfounded, and explained that these were reputable young people and that she ought to reconcile her difficulties with her husband. Her reply to this endeavor was, "No, I don't want the damned devil. All I want is his money."

Mr. Groome, a fellow-employee, testified that he observed the respondent shadowing her husband on the street during the lunch hour; that in 1933 she came to his house in a highly nervous state of mind and started to denounce her husband, charging him with being attentive to girls, and displayed evidently the

same pictures as shown to Fitzgerald and made the same character of remarks. He tried to convince her that they were not the type of young women she believed them to be and she retorted that he was as bad as her husband. In support of her conviction of her husband's infidelity, she referred to visits she had made to spiritualists and fortune tellers. This witness and Fitzgerald corroborated the libellant relative to his loss of weight, his nervous condition, and the effect his failing health had on his work.

Mrs. Groome testified that the respondent told her of the libellant's alleged misbehaviour and that he did not contribute to the support of his family as he should but spent his money on other women to whom she referred as "gold diggers," who were enticing him away from her, and that the respondent said she had gotten this information from fortune tellers and spiritualists upon whom she could rely.

The respondent denied the more serious charges and made a counter-charge that her husband had a violent temper and frequently used profanity toward her; threw objects at her and the children; violently hit her when she was pregnant; drew pictures on the wall of their home depicting her as a devil; went to picnics and other entertainment without her; called her vile names; spent his money on gifts for other women; bragged of his relationship and influence with them; drew pictures of nude women; intentionally muddied the floor and linens to cause her extra work; ran after her and the children with a knife; and other incidents of the same general character. As the trial judge stated, these are formidable charges, and, if believed, would not warrant the severance of the marital ties in this action.

The children corroborated their mother to some extent in support of these charges. The daughter, Elway, who manifested a decided hostility toward her father,

testified that he had chased and tried to strike her mother "too often to remember," that he broke "countless" dishes and many other articles; that he physically attacked her because the respondent bought her a new hat; broke her mandolin in a fit of rage, etc. Mrs. Willis, the other daughter, who, after her marriage, was absent from home for some time, testified that her father used profanity, and on occasions broke objects when in a bad temper, although she could only recall two such incidents and they were 10 or 15 years ago; but she conceded she never saw him attempt any violence toward her mother except possibly on one occasion when he tried to push or strike her. She said that sometimes he placed caricatures of her mother on the walls or curtains. Edmund testified that instead of his father's remaining silent "for months," it was merely for a day or two, and he could recall no instance when his father called his mother a "shrimp" or ridiculed her figure by comparing it to the nude pictures; that occasionally, a good many years ago, his father displayed a temper by throwing objects on the floor and twice at him; that his mother "imagined" he had relations with other women; that she went to spiritualists and fortune tellers several times and stated to him she got the idea from them that he was consorting with other women. He told of his father's drawing caricatures and putting them on the dining room wall and that, in a "half joking" manner, he would show and comment on pictures of women.

Mr. Kincella, a young man who apparently was paying attention to the youngest daughter, testified in regard to matters which tended to show, if believed, that the libellant made frivolous remarks about other women, etc.

The court, after the taking of testimony had ended, reopened the case to permit respondent to prove that about 10 months after the libellant left home, he be-

came a co-lessee with a Dorothy Howell of an automobile. There is no evidence of any improper relationship with Miss Howell or that he was in any way attentive to her prior to the separation, other than that Elway testified that her father talked about a young woman whose name was supposed to be "Dot," that he stated he had flirted with her, and acknowledged he had kept her in an apartment house. This automobile incident, in our judgment, is the most damaging on that phase of his conduct relating to his alleged fondness for women; but as it occurred months after he left his wife, we are convinced that it does not reflect much light on his conduct prior thereto.

The evidence clearly establishes that the libellant's salary never exceeded to any extent the sum of $180, and was much less for a considerable period of time. He never had sufficient means to buy gifts for other women and support them, as alleged, and at the same time provide for his wife and children, buy musical instruments, which is not denied, and pay the other expenses incident to maintaining the home.

We conclude that the testimony offered by the wife and daughters was so extravagant and partial that it did not fairly reveal the real situation; much of it, in our view, was incredible. As an example of the improbability of the wife's stories, she stated that when they lived in Sparta, Minnesota, the Finnish people had a picnic, which they attended, and that her husband took over a thousand people to the lake where it was held. In the course of the day he disappeared, and she found him sitting on the ground surrounded by 10 or 12 women, who were nude with the exception of shawls over their shoulders and hats on their heads. The libellant denied this alleged occurrence and stated that they lived in Sparta only during winter months. In isolated instances, the libellant may have lost his temper and at times been somewhat indiscreet, but

his shortcomings were not of such a serious character as to incite the continuous indignities of which the respondent was undoubtedly guilty: *Andrew v. Andrew,* 121 Pa. Superior Ct. 152, 182 A. 706. Notwithstanding all the libellant's alleged immorality and promiscuous attention to other women, there is no concrete evidence of any unfaithfulness on his part. We do not accept as true the statement that the libellant told his wife he kept a paramour. That, like many of her other statements, as we conceive the testimony, was largely a figment of the imagination of a nervous woman. The lack of corroboration of the wife's charges by unbiased and credible witnesses in this case is quite significant.

We concur with the view of the trial judge, whose conclusions are entitled to the fullest consideration as he had the advantage of seeing and hearing the witnesses.

Decree affirmed.